AO 106 (Rev. 04/10) Application for a Search Warrant                                    TP

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 2:22-mj-657
)
The residence located at 4206 SORREN COURT, )
Columbus, Ohio 43230 including curtilage )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A INCORPORATED HEREIN BY REFERENCE

located in the ___Southern___ District of ___Ohio___, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B INCORPORATED HEREIN BY REFERENCE

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 922(g)(1) | Felon in possession of a firearm |
| 21 USC §§ 841 (a)(1) | Distribution of a Controlled Substance |
| 18 USC §§ 922(o) | Illegal Possession of a Machine Gun |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jeffrey Kasza, TFO ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: October 3, 2022

City and state: Columbus, Ohio

Kimberly A. Jolson
United States Magistrate Judge

# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: The residence located at 4206 SORREN COURT, Columbus, Ohio 43230 including curtilage, detached buildings, any person located therein who may possess any form of digital device, and any digital devices located therein/thereon | Case No. 2:22-mj-657 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Jeffrey Kasza**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **4206 SORREN COURT** Columbus, Ohio 43230, hereinafter "Premises," further described in Attachment A, for the things described in Attachment B.

2. I am a Columbus, Ohio Division of Police (CPD) detective assigned as a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I have been employed by the Columbus Division of Police since 2004. My responsibilities as a Task Force Officer include the investigation of violent criminal street gangs, narcotics and firearms traffickers, money launderers, and firearms-related crimes. I have participated in the execution of search warrants and arrests related to the above-referenced offenses. By virtue of my experience and training, I am familiar with residential search warrants. Throughout this Affidavit, reference to "investigators" specifically refers to criminal investigators.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have not omitted any facts that would negate probable cause.

4.      Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, heroin, fentanyl, and other controlled substances that are, by themselves, illegal to possess. I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in their trade. During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

5.      I have participated in various aspects of drug-related investigations. I have participated in controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers. I have prepared affidavits submitted in federal court in support of applications for criminal complaints, search warrants and/or arrest warrants. I have participated in numerous investigations involving a variety of investigative techniques, including physical and electronic surveillance methods; controlled purchases; the analysis of a

wide variety of records and data, including pen register and trap and trace data as well as cell phone location data; and the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

6. Through investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to distribute, transport, store, import, and safeguard-controlled substances. I know that narcotics trafficking organizations have developed a number of methods to insulate their illegal activities from law enforcement detection. For instance, I know that members of narcotics trafficking organizations routinely utilize electronic communications facilities, including cellular telephones and mobile messaging applications such as Snapchat, to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members; that organization members routinely use coded references in an effort to avoid law enforcement detection; and that the communication of time-sensitive information is critical to the successful conduct of these organizations' illegal activities. I am also familiar with narcotics traffickers' use of prepaid cellular and cellular phones, normal land line phones, public phones, debit calling cards, counter-surveillance, and the use of false and/or fictitious identities. Finally, I am familiar with the coded language used by narcotics traffickers during conversations in an attempt to disguise the true meaning of their conversations.

7.  I also know, from my training and experience that "cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." Carpenter v. United States, 138 S. Ct. 2206, 2220 (citing Riley v. California, 573 U. S., at ___, 134 S. Ct. 2473, 2484 (2014))

8.  Specifically, to this search warrant through training and experience I know that individuals who traffick in narcotics frequently utilize cell phones to take photographs and videos of their narcotics. These photographs and videos are often posted to social media using a cell phone. These same individuals also utilize cellphones, to include calls, texts, and social media applications, to arrange the purchase and sale of narcotics.

9.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 922(o), Illegal possession of a machine gun, Title 18, United States Code, Section 922(g)(1) Felon in Possession of a Firearm and Title 21, United States Code, Section 841 (a)(1) Distribution of a Controlled Substance and have been committed by Dylan POLK and his associates. There is also probable cause to search the PREMISES described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes, as further described in Attachment B.

4

## APPLICABLE STATUTES AND DEFINITIONS

1. Title 18, United States Code, Section 922(g)(1) makes it a federal crime for a person to knowingly possession a firearm after being convicted of a crime punishable by imprisonment for a term exceeding one year.

2. Title 21, United States Code, Section 841 makes it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense a controlled substance. Subsection (b) of this section makes cocaine, cocaine base, heroin, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, and any of their isomers controlled substances.

## BACKGROUND REGARDING ACTIVITIES OF DRUG TRAFFICKERS

10. Your affiant has learned through training and experience the ways in which narcotics traffickers conduct their business, including methods of distributing narcotics, the use of home-based telephones and the use of cellular telephones, and the use of vehicles to facilitate their illegal activities. Your affiant's training and experience as a CPD detective and an ATF TFO form the basis of the opinions and conclusions set forth below. Based on your affiant's training, experience, and the experience of other officers, detectives, and agents, your affiant is aware:

   a. that narcotics traffickers often place assets in names other than their owner and/or use fictitious identification to avoid detection of these assets by government agencies or local law enforcement;

   b. that even though these assets are in other persons' names the narcotics traffickers continue to exercise dominion and control;

   c. that narcotics traffickers must maintain and finance their ongoing narcotics activities, as well as for paying bills, acquiring assets, and making other purchases;

5

d. that it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, bus tickets, rental car receipts, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, purchasing, processing, storage, sale and distribution of drugs, and the collection of its proceeds. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the narcotics traffickers have ready access to them;

e. that it is common for narcotics traffickers to secrete contraband, proceeds of drug sales, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value; and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money made from engaging in narcotics trafficking activities in secure locations within their residences and/or other locations over which they maintain dominion and control, in order to have ready access to them;

f. that it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotic proceeds, such as: currency, financial instruments, precious metals and gem stones, jewelry, books, records, invoices, receipts records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, loan records, money orders, bank drafts, cashier checks, bank checks, wire transfers, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences and/or other locations which they maintain dominion and control;

g. that when drug traffickers amass a large amount of proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits;

h. that to accomplish these goals, narcotics traffickers utilize, including, but not limited to, foreign and domestic banks and their attendant services, Western Union and other wire transfer or Money Service Businesses sales agents, check cashing services, real estate agents, securities brokers, accountants, attorneys, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

i. that narcotics traffickers often utilize electronic equipment such as currency counting machines, telephone answering machines, telephone caller identification boxes, and cellular telephones in their drug activities;

6

j.  that drug traffickers often take or cause to be taken photographs/video tapes of themselves, their associates, their property, and their products. These traffickers usually maintain these photographs/video tapes in their residences and/or other locations in which they maintain dominion or control, including on electronic devices which are used to post such photographs/videos on social media or other websites or applications;

k.  that the sale of controlled dangerous substances, generates large quantities of United States currency (aka, street money);

l.  that is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

m.  that the Currency Transaction Report (CTR - IRS Form 4789), which is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

n.  that in order to evade the filing of a Currency Transaction Report (CTR), narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

o.  that narcotics traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their suppliers, customers, and other associates involved in their narcotics trafficking organization;

p.  that drug traffickers commonly have in their possession, that is on their person, at their residences and/or other locations over which they maintain dominion and control, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency; and

q.  that courts have recognized unexplained wealth is probative evidence of crimes, in particular, trafficking in narcotics.

## POLK'S CRIMINAL HISTORY

11. Arrests
    a. July 18, 2011- Arrested by CPD for domestic violence and assault
    b. August 31, 2011- Arrested by Franklin County SO for domestic violence and assault
    c. July 1, 2014- Arrested by Franklin County SO for possession of felony drugs
    d. May 28, 2015- Arrested by CPD for possession of drugs (F2), possession of drugs (F2), possession of drugs (F4) and possession of drugs (F5)

12. Convictions
    a. August 3, 2011- Convicted of falsification (M1)
    b. September 20, 2011- Convicted of domestic violence (M1)
    c. February 16, 2016- Convicted of trafficking in drugs and failure to comply with order of police officer.
    d. June 22, 2016- Convicted of possession of felony drugs and resisting arrest.

## PROBABLE CAUSE

13. In January 2022, ATF received information that Dylan POLK, a previously convicted felon, had been identified by a reliable source of information as a large-scale narcotics trafficker operating in the Columbus, Ohio area.

14. Furthermore, investigators are aware that POLK had been previously identified by an ATF source of information in 2021. This source of information also reported that POLK, aka "Dunk", was a large-scale narcotics trafficker. The source of information also added that POLK was known to possess a Glock firearm with an accessory that made it capable of functioning as a fully automatic firearm, commonly referred to as a "Glock Converter Switch" or "Glock Auto Sear." Investigators are aware that, even though widely available for purchase, said devices have

8

been classified as a "machine gun" under the National Firearms Act (NFA) and are illegal to possess pursuant to Title 18 U.S.C. §922(o).

15. Additionally, investigators have been notified by the Adult Parole Authority (APA) that POLK is an active Parolee who resides 6183 Winnebago St, Grove City, Ohio 43123 and actively utilizes telephone number (614) 508-3635 to communicate with his Parole Officer.

16. On December 14, 2021, Franklin County Municipal Court Judge Michael King granted a search warrant for 1890 South 4th Street Columbus, Ohio 43207 (hereinafter 1890 South 4th Street). On December 15, 2021, at approximately 9:02 a.m., Columbus Police Department IN/TAC made entry into 1890 South 4th Street.

17. A search of 1890 South 4th Street operated by Christina Brown revealed the following: suspected crack cocaine, suspected fentanyl, approximately four thousand six hundred and fifty-four dollars ($4,654.00) in U.S. currency, a stolen dirt bike, two (2) firearms, and ammunition.

18. On December 15, 2021, Central Ohio Human Trafficking Task Force (COHTTF) investigator interviewed a cooperating defendant (CD1) out of the search warrant executed at 1890 S. 4th St. The following is a summary of his/her statements.

- CD1 is familiar with Christina Brown. CD1 stated "Dunk" was Christina's boyfriend but he/she hasn't ever met him.

- CD1 stated they sell drugs out of this house, primarily fentanyl.

- CD1 stated that there were two guns in the house that he/she knew of. CD1 stated one person threw the gun as they were trying to run out of the back door. CD1 stated the other gun was in the couch.

9

19. CD2 out of the same search warrant stated he/she has been staying at 1890 South 4th Street for a week.

- CD2 stated Christina Brown is selling narcotics out of 1890 South 4th Street.
- CD2 stated "Dunk" is providing narcotics to 1890 South 4th Street.
- CD2 stated "Dunk" is Brown's boyfriend.

20. On or about January 12, 2022, investigators conducted an interview of a known reliable confidential source (CS) who stated he/she had information about an armed narcotics trafficker.

21. The CS stated that he/she had information about a violent firearms and narcotics trafficker whose name was Dylan POLK. The CS stated that POLK is operating his illegal firearm and narcotics operation out of the Strawberry Farms neighborhood of Columbus Ohio.

22. POLK is further identified as follows:

Dylan D. POLK
Black Male
FBI #193204MD8

23. The CS stated that POLK goes by the street name of "DUNK".

24. The CS stated that a male named David MARCUM sells narcotics for POLK and has just sold POLK a firearm for $600 a few weeks prior.

25. MARCUM is further identified as follows:

David J. MARCUM
White Male
FBI #744712DB2

10

26. The CS stated that POLK has made statements that he is looking to purchase and sell firearms.

27. The CS stated that POLK sells cocaine, heroin, fentanyl and meth (methamphetamine). The CS stated that he/she had witnessed POLK open a brick (slang term commonly used to refer to a kilogram of narcotics) of fentanyl and cut the fentanyl right off the brick for sale. The CS stated that POLK is a high-end narcotics dealer who supplies mid-level drug dealers' large amounts of narcotics.

28. The CS stated he/she was inside POLK's residence located in the Strawberry Farms area of Columbus. The CS stated he/she has seen POLK with numerous bricks of fentanyl and heroin. The CS stated that he/she has witnessed POLK with large amounts of U.S. Currency. The CS stated that POLK had made statements that he had $500,000 of U.S. Currency in the closet of his home.

29. The CS stated that POLK made a statement that he recently robbed a Mexican cartel member and stole $250,000 of U.S. Currency from the Mexican cartel member. The CS stated that POLK made a comment that with the $250,000 he just had stolen from the Mexican cartel, he now has over one million dollars of U.S. Currency in his possession.

30. The CS stated that POLK had made statements that he gets his narcotics supply directly from the Mexican cartel.

31. The CS stated that POLK frequently spoke about owning firearms and made statements that he was always looking to purchase firearms for cash.

11

32. The CS stated that he/she has used POLK'S personal phone numbers to text POLK about narcotics sales and POLK had in the past sent the CS pictures of large amounts of packaged narcotics.

33. The CS stated that POLK also used Facebook to operate his narcotics operation and has sent narcotic information using the Facebook messenger application.

34. On February 14, 2022, investigators conducted an interview of a Confidential Source (CS2) who stated he/she had information about an armed narcotics trafficker named POLK.

35. CS2 stated that POLK is a large-scale narcotics trafficker who operates his illegal narcotics operation in the Columbus, Ohio area.

36. CS2 stated that POLK is selling and supplying numerous midlevel narcotics dealers in all different areas of Columbus.

37. CS2 stated that POLK moves/sells multiple kilos of fentanyl a month.

38. CS2 stated that POLK also sells cocaine and stated that he also has a connection to purchase meth.

39. CS2 stated that POLK has made statements that he is paying the rent on four different apartments. CS2 stated that he/she has been to the apartment that POLK stated he lives at.

40. On February 14, 2022, your affiant and investigators drove CS2 and had CS2 point out POLK's home address. CS2 directed your affiant to the Bradford Apartments. CS2

described and then pointed out 4206 SORREN COURT, Columbus, Ohio 43230 as POLK's home address.

41.   CS2 stated that he/she had been to 4206 SORREN COURT approximately 12 times to purchase fentanyl. CS2 stated that POLK was at the address each time and was the one who supplied CS2 with narcotics out of that location. CS2 stated that POLK made statements that he lived and slept at 4206 SORREN COURT. CS2 stated that POLK lived with a female and a young child.

42.   CS2 stated POLK showed him/her 16 wrapped kilos of fentanyl inside of 4206 SORREN COURT. CS2 stated that POLK had a narcotics press inside of 4206 SORREN COURT that he would use to package smaller amounts of narcotics for sale off of the wrapped kilos of fentanyl.

43.   CS2 stated that he/she had witnessed POLK with three Glock handguns that were modified to fire fully automatic inside of 4206 SORREN COURT. CS2 stated that POLK always carried a fully automatic Glock every time CS2 saw him.

44.   CS2 stated that POLK showed him/her two very expensive watches that POLK stated he paid over 70k for each of the two watches.

45.   CS2 stated that POLK bragged about recently purchasing two Dodge Hellcat vehicles for an investment with proceeds made from his narcotics sales.

46.   CS2 stated that he/she witnessed POLK with stacks of U.S. Currency inside of 4206 SORREN COURT. CS2 stated that POLK bragged about storing $500K of U.S. Currency in the closet of this location.

47. CS2 stated that POLK bragged about robbing a Mexican Drug Dealer for a large amount of narcotics.

48. CS2 stated that POLK made comments about owning an AR-15 style rifle.

49. On August 25, 2022, investigators met with CS 3 relating to Dylan POLK, aka "Dunk."

50. CS3 reported that POLK is a large-scale fentanyl trafficker operating in the Columbus, Ohio area. CS3 stated POLK is known to supply narcotics to many well-known drug traffickers in Columbus, to include an individual identified as Gage BROWN.

51. It should be noted that investigators are aware that on or about August 17, 2022, the Columbus Police Community Response Team (CRT) 2 executed a state search warrant at 393 E 20th Avenue, a residence controlled and occupied by Gage BROWN. It is reported that approximately 21 firearms and approximately 300 grams of heroin were seized from the home.

52. CS3 notified investigators POLK is active on social media and utilizes the Instagram account found at Uniform Resource Locator (URL) https://www.instagram.com/dunkalmighty/. CS3 reported POLK has contacted CS3 via Instagram messenger as recently as July 2022. Additionally, CS3 notified investigators POLK provided his telephone number (614-508-3635) to CS 3 in order to communicate via cellular device.

53. On August 25, 2022, your affiant conducted surveillance of 4206 SORREN COURT, Columbus, Ohio, a residence believed to be occupied by Dylan POLK. The following was observed:

14

54. At approximately 1:20 pm, POLK exited the above-listed residence and walk out onto the patio area on the above-listed apartment.

55. At approximately 1:22 pm, POLK walked back inside of the above-listed residence.

56. At approximately 1:23 pm, POLK exited the above-listed residence and walk out to the patio area of the apartment. POLK then took a seat on a chair that was on the patio.

57. At approximately 2:19 pm, a 2015 gray Honda Civic, Ohio license plate JND4337, pulled into the apartment complex and park. An unknown black male exit the passenger's front door of the gray Honda Civic and walked in the direction where POLK was sitting. Your affiant could see that the unknown male was carrying a white package in his right hand.

58. The unknown male met up with POLK and POLK and the unknown male walked into the above-listed residence. The unknown male carried the white package into the apartment.

59. At approximately 2:24 pm, POLK and the unknown male exited the above-listed residence. Your affiant could see that the unknown male was not carrying the white package when he exited the apartment with POLK.

60. POLK then sat back on the patio of the apartment and the unknown male walked back to the gray Honda, entered the front passenger door of the Honda and the vehicle left the area. Your affiant could not see who was driving the Honda.

61. At approximately 2:30 pm, POLK entered the above-listed residence, and your affiant terminated surveillance.

15

62. On September 19, 2022, at approximately 12:45 pm, investigators responded to the area of 6183 WINNEBAGO ST and initiated surveillance relative to this investigation. Parked in the driveway of the above listed location was a Dark Gray Dodge Durango RT with an Ohio Temporary Tag, P532652.

63. At approximately 1:00 pm, investigators witnessed a white female exit 6183 WINNEBAGO ST with a young child. The female opened the rear passenger door to the Dodge Durango and placed the young child into the rear passenger's seat of the Dodge.

64. Investigators witnessed POLK exit 6183 WINNEBAGO ST right after the female white. POLK walked and stood next to the vehicle.

65. Investigators witnessed POLK open the front passenger's door of the Dodge Durango and get into the vehicle. POLK appeared to take an unknown item from his front pants waist area and place the unknown item underneath the front passenger's seat of the Dodge Durango.

66. Investigators witnessed the white female shut the rear passenger's door and get into the front driver's seat of the Dodge Durango. POLK shut the front passenger's door and remained in the vehicle. The female backed the Dodge Durango out of the driveway and drove southbound on Winnebago St.

67. Investigators followed the vehicle to The Bradford At Easton Apartments where the vehicle parked directly in front of 4206 SORREN COURT.

68. At approximately 1:45 pm, investigators witnessed POLK exit the front passenger's side of the Dodge Durango. Investigators witnessed POLK walk to and enter 4206

16

SORREN COURT. After POLK entered 4206 SORREN COURT the female drove out of the area in the Dodge Durango.

69. On September 21, 2022, your affiant spoke to a resident that lives in the area of 6183 WINNEBAGO ST. The resident stated that they believe suspicious activity is being conducted out of 6183 WINNEBAGO ST. The resident stated that a few weeks ago, two black males, one white female and numerous children moved into the above-listed address. The resident stated that he/she had never seen a moving truck bring any furniture to the above-listed address.

70. The resident stated that he/she had witnessed two new looking Chevrolet Camaros show up at the above-listed residence every few days. The Chevrolet Camaros only stay a few minutes each, and then leave. The resident stated he/she believes this activity is suspicious. Your affiant knows through his training and experience that the activity described by the resident is consistent with a location that is selling narcotics.

71. Your affiant showed the resident a picture of POLK and the resident identified POLK as one of the male's that moved into 6183 WINNEBAGO ST. The resident stated that POLK drives the Dodge Durango that was seen parked in the driveway. Your affiant identified the Dodge Durango to be the vehicle with the Ohio Temporary tag P532652.

72. The resident stated that they believe POLK is sleeping at the about listed location and stated that there are numerous children in and out of the home.

73. Based upon the above listed information and based upon my training and experience, your affiant believes that POLK is trafficking in narcotics out of 4206 SORREN

17

COURT. Your affiant also believes that POLK is living at 6183 WINNEBAGO ST and is likely storing proceeds from his narcotics operation at this location.

74. On September 27, 2022, your affiant presented United States Magistrate Judge Chelsey M. Vascura with a federal search warrant for the address of 4206 SORREN COURT. On September 28, 2022, United States Magistrate Judge Chelsey M. Vascura found probable cause and signed the search warrant that was presented by your affiant.

75. On October 3, 2022, at approximately 8:00 am, investigators conducted a briefing concerning the execution of the above-listed search warrant.

### SEARCH WARRANT EXECUTION:

76. On October 3, 2022, at approximately 10:00 am, ATF TFOs, ATF SAs and CPD Officers executed the federal search warrant at 4206 SORREN COURT, Case number 2:22-mj-645. A copy of the federal search warrant is attached as Attachment C.

77. ATF SAs approached 4206 SORREN COURT and SA Petit knocked and announced their presence multiple times. Eventually, SAs were met at the front door by Dylan POLK who was removed from the home and temporally detained. Investigators noticed that POLK's hands were wet and had soap suds on them.

78. Once the location was deemed clear and no other occupants were located, investigators took photographs of the residence, showing an accurate depiction of the location prior to the search.

79. Investigators noticed that there was dripped water on the floor when they entered the apartment. Investigators located what appeared to be a narcotics kilo wrapper with white

18

residue that was in the bathroom toilet. Investigators also located two bags of white powder, a large block package that contained white powder on the kitchen counter, and a narcotics press on the floor in the kitchen in close proximity to the large block of white powder. Investigators believe the white powder found in apartment is consistent with illegal narcotics.

80. Investigators found two pistols concealed underneath the living room couch and one of the pistols was a Glock that had a switch attached to the pistol. Investigators also found an AR Style rifle, and two more pistols in the closet that is attached to the living room.

## CONCLUSION

81. I submit that this affidavit supports probable cause for a warrant to search the PREMISIS described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Jeffrey Kasza
Task Force Officer, ATF

Subscribed and sworn to before me this 3rd day of September 2022.

Kimberly A. Jolson
United States Magistrate Judge